# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br><br>vs.<br><br>ADRIAN ZITALPOPOCA-<br>HERNANDEZ,<br><br>Defendant. | CASE NO. 08cr4304(1) - BEN<br><br>MEMORANDUM OPINION<br>ON RE-SENTENCING |

This case was remanded for re-sentencing so that the Court can explain why it rejects Defendant's argument – the defense argument that imposing a 200-month sentence constitutes a so-called "unwarranted sentencing disparity" in his case. Re-sentencing was held on December 19, 2017.[1]  This Opinion memorializes and

---

[1]Defendant was present, in custody, and represented by Assistant Federal Defender Kara Lee Hartzler.  The Government was represented by Assistant United States Attorneys Christopher Paul Tenorio and Mark Roland Rehe.  The

supplements the oral findings and conclusions of the Court.

## I. FACTS & TESTIMONY

The course of Defendant's criminal conduct and the facts leading up to his crimes of conviction provide the needed context for fashioning an appropriate sentence and rejecting the unwarranted sentencing disparity argument. Defendant's actions were not the product of a momentary lapse of judgement or an isolated act of financial desperation. Defendant took his time. He planned and implemented his criminal scheme over days, weeks, and months. The Court finds the following facts to be true beyond a reasonable doubt.

### FLORENCIA

Florencia was 17 years old and living in Mexico. She came from a poor family. She was going to elope with her boyfriend and agreed to meet him at a bus station. After waiting five or six hours, her boyfriend never showed up. The Defendant Adrian Zitlalpopoca did. Defendant offered to help Florencia. He loaned her his cell phone to make a call, then left. He returned later around midnight. It was cold. He loaned her his sweater. Defendant told Florencia that the next bus would not depart until morning. He offered to drive her to his

Court heard the arguments of counsel and heard from the Defendant. At the conclusion of the hearing, the Court announced the sentence.

"sister's" house and he would return her the next morning.

After spending a short time at the "sister's" house, he drove her to his mother's house in a nearby town.  There they became intimate.  He asked her to be his "wife."  He then drove her to his brother's house in Tlaxcala, Mexico.  While en route he told Florencia not to listen to gossip that she might hear.  A couple of weeks passed.  He took Florencia to see a fancy car and fancy house that belonged to his friend.  Florencia testified that after he showed her the car and the house he suggested she become a prostitute.  He told her that he owed a debt and that if she agreed, it would help him out.

At first she refused.  Then she refused again.  Eventually, she relented.  Once she surrendered, she was introduced to his friend's "wife" or "woman" who was also a prostitute.  The woman traveled with Florencia to another town called Puebla, Mexico, where Florencia was introduced to prostitution.  Florencia testified that she worked five or six days a week.  She gave all of her earnings to Defendant at his instruction.

In 2005, Defendant directed Florencia to travel to Tijuana, Mexico, where she could earn more money.  Florencia testified that on one occasion when Defendant did not come home at night she went looking for him.  He responded by grabbing her by the hair.  He punched her in the face.  He kicked her.  On another

occasion he whipped her – with the cord to an iron. She heard that Defendant was looking for other woman to work for him. Defendant told her that "some come, some leave."

Florencia learned that Defendant and another woman[1] had traveled to the United States and that she was working for Defendant. Defendant and Florencia had talked about traveling to the United States before. Upon learning that Defendant was in the United States with Annabel, Florencia asked to also be brought to the United States. Defendant arranged for Florencia to be smuggled in.

Within 3 or 4 days after arriving in the United States, Florencia began once again working as a prostitute. She would work in what evidence showed were the brushy canyons of San Diego's back country. After her arrest, Florencia was contacted by two of Defendant's brothers, Juan and Tonatiuh. She knew Tonatiuh was violent. She feared that Defendant and his family would come after her if she "turned on him."

### ANNABEL

Annabel was 18 years old and living in Mexico. Her parents were also field laborers. She was going to college. In March of 2006, she was at a public park. Defendant approached her. They began to talk. He lied to her. He told her he was

---

[1] The other woman was Annabel – who is discussed infra.

younger than his actual age.[2]  Defendant told her that he worked buying and selling clothing.  They saw each other over several weekends at the park.  Eventually, he asked her to marry him.

He told Annabel that he had been working in the United States.  He told Annabel that they could go to the United States to work, save money, and get married.  One week before the school year was over, she left school with Defendant.  They traveled to another town.  Again, in Tlaxcala, Mexico.  He took her to a house he said was his.  The next morning Defendant introduced her to his mother, sisters, and brothers as his wife.

On the second night, Defendant left.  He told her he was going to go to work.  He told her she was not allowed to speak to anyone.  She was not to leave the house, or speak to anyone or use the phone.  She did not go out of her room very much.  Defendant told her she could not talk to his family.

One night while they were together, Defendant suggested that she should work as a prostitute.  He told her that he had a friend that had made a lot of money in prostitution and that they could too.  She became upset and started crying.  But "he insisted."  Defendant told her that if she loved him, she would do it.  He told her that if she became a prostitute, then they would get married and she could help

_____

[2] Defendant is approximately 11 years older than Florencia and Annabel.

her family.

She refused.

He left for Tijuana, Mexico. While away he would call her. She told him she missed him and wanted to be with him. He told her that she could come to Tijuana, "but you know what for."

She too relented. Defendant arranged for a friend to bring her food. When Annabel told Defendant she would work as a prostitute, the next day, his friend and his wife brought her clothes. They then took her to work. Again to the town of Puebla, Mexico. She was told what clothes to wear and how much to charge. She worked in Puebla three days from noon to 9:00 p.m.

Defendant then sent her an airplane ticket to travel to Tijuana. While she worked in Puebla, she gave her earnings to Defendant's friend, Jose, with Defendant's "permission." She then flew to Tijuana with the woman who had taught her and taken her to Puebla. The next day, she began working in Tijuana.

She would work from 7:00 p.m. to 3:00 a.m., or later. She worked every day. Defendant told her the money she earned was his and she had to give it to him. When she tried to keep some of the money, he took it away from her.

In September 2006, he sent her to buy food. She looked in his wallet for money and found a condom. She asked him why he had a condom. He responded

by throwing a remote control device at her, hitting her on the leg. Defendant then grabbed her hair and hit her in the face – with his fist. He hit her in the mouth with his fist. She became very scared.

In January 2007, he took her to a party. Defendant saw her talking to another woman. He had told Annabel earlier that she was not allowed to talk to anyone. Defendant reacted by hitting Annabel on the leg with his fist. He hit her with his elbow. He hit her in the mouth. He grabbed her by the arm and dragged her toward the car. He continued hitting her. Annabel testified that Defendant was angry with her frequently. Annabel testified that there were other occasions when he would hit her.

Defendant then moved Annabel to Mexico City to continue her work. She continued to deposit the money she earned into Defendant's bank account. At one point, she called Defendant and said she wanted to return to Tlaxcala to be with him. He told her that if she returned to him, she would not have to work as a prostitute anymore. And so she planned to return to Tlaxcala. Instead, he met her at the airport in Mexico City. He said to her: "You thought that I was going to leave everything for you and that you weren't going to work anymore, well, I lied to you." Defendant then took Annabel back to Puebla to continue to work. He took her to his parents' house. He then left again.

08cr4304(1) - BEN

On one occasion while in Tlaxcala, Defendant and Annabel were at a park. They argued. She threw a corncob on the ground. Defendant then began hitting her. He hit her and hit her until she bent down to pick up the corncob – not with her hand, but according to his orders – with her mouth.

Annabel testified that Defendant abused her on other occasions. On one occasion, he whipped her, just like he had whipped Florencia. With a cable. He also hit her with a broomstick. Annabel also testified that Defendant told her that his friends were looking for a woman who had gone to the police in order to "kill her, beat her or something, but they wanted to find her." She testified that she became scared.

Defendant told Annabel that if they came to the United States she would be his only woman. Of course, that proved not to be true.[3]

Defendant arranged to have himself and Annabel smuggled into the United States. When they arrived in the United States, Defendant told Annabel that she had to work in order to repay Defendant's cousin who had paid the smuggler's fee. She began working two days after arriving in the United States. Annabel testified that she worked at a "ranch." She also testified that they used plastic tarps to lay

---

[3] The evidence showed that at the time Defendant was arrested he was prostituting both Annabel and Florencia.

08cr4304(1) - BEN

down on while she and Florencia worked.  Annabel lived with Defendant's cousin, co-defendant Eduardo Aguila and his wife.  Annabel also testified that she was scared of Defendant.

## II.  PROCEDURAL HISTORY

Defendant Adrian Zitalpopoca-Hernandez was indicted on December 10, 2008.  A Superceding Indictment was filed April 8, 2009.  In that Indictment, Defendant was charged with the following crimes: Counts 1 & 2, Title 18, U.S.C., §§ 1591(a) (1) and (b)(1) - Sex Trafficking by Force, Fraud, or Coercion; Counts 3 & 4, Title 18, U.S.C., § 2422(a) - Persuasion or Coercion to Travel to Engage in Prostitution; Counts 5 & 6, Title 8, U.S.C., § 1328 - Harboring Aliens for Purposes of Prostitution; Counts 7 & 8, Title 8, U.S.C., § 1324(a)(2)(B)(ii) - Bringing Illegal Aliens into the United States for Financial Gain; Title 18, U.S.C., § 2 - Aiding and Abetting; Counts 9 & 10, Title 8, U.S.C., § 1324(a)(1)(A)(iii) and (v)(II) - Harboring Illegal Aliens and Aiding and Abetting; Count 11, Title 8, U.S.C., § 1326(a) - Deported Alien Found in the United States.

A three-day trial was held in January 2010.  The jury returned a guilty verdict in just 99 minutes.  Defendant was found guilty on Counts one through ten.  Count 11 was dismissed.

This Court sentenced the Defendant to a total custodial term of 292 months.

An appeal was filed. The Court of Appeals reversed the convictions on Counts 1, 2 & 4, and remanded for re-sentencing on Counts 3, 5, 6, 7, 8, 9, and 10. *U.S. v. Zitalpopoca-Hernandez*, 495 F. App'x 833, 835-36 (9th Cir. Nov. 7, 2012). The Court of Appeals determined there was insufficient evidence for the § 1591 convictions (Counts 1 & 2). It reasoned that although there was evidence that Zitalpopoca physically assaulted the women on numerous occasions in Mexico, there was no evidence of assaults in the United States and whatever assaults had occurred took place prior to 2008 (which was the beginning date specified in the Indictment). *Id.* The Court of Appeals also determined that there was insufficient evidence for one of the § 2422(a) convictions (Count 4) because, in its words,

> [t]he evidence at trial demonstrated that it was Florencia who persuaded Zitlalpopoca to bring her to the United States, not the other way around. *Contra United States v. Rashkovski*, 301 F.3d 1133, 1135 (9th Cir. 2002) (sufficient evidence supported § 2422(a) conviction where defendant traveled to Russia, held recruiting meetings to promote prostitution in the United States, and arranged and paid for Russian women to travel to the United States to work as prostitutes).

*Id.* at 836. After remand, Defendant was re-sentenced for a total custodial term of 262 months. Another appeal followed and again the Court of Appeals reversed. It held that this time the Sentencing Guidelines were improperly computed by applying a sexual abuse enhancement under § 2241 and a vulnerable victim

enhancement under U.S.S.G. § 3A1.1(b).  *U.S. v. Zitalpopoca-Hernandez*, 632 F. App'x 335, 337 (9th Cir. Dec. 28, 2015).  It was also error to impose mandatory restitution.  *Id.* at 338.  The case was again remanded for re-sentencing.

 On April 18, 2016, Defendant was re-sentenced: Counts 3, 5, and 7 - 100 months as to each count concurrently; Counts 6 and 8 - 100 months as to each count concurrently; Counts 9 and 10 - 60 months as to each count concurrently; Counts 3, 5, and 7 to run consecutive to Counts 6 and 8; Counts 9 and 10 to run concurrent as to all counts.  In total, the Court imposed a sentence of 200 months.  A third appeal followed and a third remand.  *U.S. v. Zitalpopoca-Hernandez*, 709 F.App'x 428, 430 (9th Cir. Sept. 26, 2017).

This remand is the reason for the present sentencing.

The remand was occasioned by this Court's lack of explanation for rejecting an "unwarranted sentencing disparities" argument offered for the very first time at the end of a late-filed, last-minute pleading.  Sentencing had been set for the morning of Monday, March 28, 2016.  Defense counsel filed late the memorandum electronically on the afternoon of Thursday, March 24, 2016 at 4:15 p.m.  (*i.e.*, the Thursday before the Monday sentencing).   A printed copy of the memorandum was delivered to chambers the following day.  Faced with a newly-minted sentencing argument – to which the Government had no opportunity to respond –

and with which the Court had little time to consider, the sentencing hearing was re-set for April 18, 2016.[4]

On December 19, 2017, Defendant was again sentenced. The Court again imposed a 100 month sentence on each of Counts 3, 5, and 7, with the counts to run concurrently. The Court also imposed a 100 month sentence on each of Counts 6 and 8 with the counts to run concurrently. On Counts 9 and 10, the Court imposed 60 months each to run concurrently and to run concurrently with all other Counts. The concurrent 100 month sentences for Counts 3, 5, and 7, run consecutively to the 100 month sentences for Counts 6 and 8. The resulting total custodial sentence time remains 200 months.

## III. DEFENDANT'S "UNWARRANTED DISPARITIES" ARGUMENT

The reason for this re-sentencing (as noted above) is that Defendant made a late-filed, last-second, newly-minted argument that this Court did not orally address during the sentencing hearing. That argument cobbled together a dozen

---

[4]Local Rule 32.1(a)(7) provides that a sentencing memorandum shall be filed and served no less than seven days before the sentencing date. Local Rule 32.1(a)(12) advises counsel that "the filing dates . . . are critical." Any document not timely filed can be disregarded. *Id.* ("*Absent a showing of good cause, any late filings by counsel will not be considered by the court.* Log these dates and comply.") (emphasis in original). The Court did not strike the late-filed sentencing memorandum. It continued the sentencing hearing so that it could review and have time to reflect on the memorandum's content.

lighter sentences in other local cases and argued that a 200-month sentence would

be an "unwarranted disparity."**5**  The Court of Appeals remanded the case because,

"[w]hen a party raises a specific, nonfrivolous argument tethered to a relevant

---

[5]Although § 3553(a)(6) identifies unwarranted sentencing disparities as an
outcome to be avoided in imposing sentence, disparities are normally warranted.
As stated before, no one disputes that federal sentences are required to be
individualized.  Sentences warrant individualized disparities based upon the other
§ 3553(a) factors – *i.e.,* § 3553(a)(1) through (5).  Where a sentence is above or
below the average, but based on an individual's § 3553(a)(1) through (5)
considerations, the resulting disparity cannot be said to be "unwarranted.*" See
e.g., U.S. v. Gonzalez-Zotelo*, 556 F.3d 736, 740 (9th Cir. 2009) (holding that
some disparities are clearly warranted like fast-track downward departures in
border districts because Congress authorizes the disparity).

Defendant's memorandum offered no help untangling this seeming
tautology.  He did not even attempt to define what constitutes an unwarranted
disparity other than to imply higher sentences are "unwarranted" because they are
higher than desired.  One court of appeals describes the difficulty that exists for
trial courts applying the unwarranted disparities factor:

> *It is not entirely clear what exactly it means for a district judge to
> consider the effects of an individual defendant's sentence on nationwide
> disparities.*  On the one hand, in order to avoid redundancy with
> § 3553(a)(4), it must require something different than mere consideration of
> the Guidelines, which are the statute's primary vehicle for reducing
> nationwide sentence disparities.  On the other hand, it cannot be that a judge
> must act as social scientist and assess nationwide trends in sentencing with
> each new defendant – in effect, intuiting Guidelines revisions on an interim
> basis as a proxy for the Sentencing Commission.  *We think the mandate to
> take into account nationwide disparities under § 3553(a)(6), as distinct
> from the need to give due weight to the Guidelines under § 3553(a)(4), is
> modest.*

*U.S. v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007), *abrogated on other grounds by
Kimbrough v. U. S.*, 552 U.S. 85 (2007) (emphasis added).

§ 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." *Id.* (quoting *U.S. v. Carty*, 520 F.3d 984, 992-93 (9th Cir. 2008) (*en banc*)).

## A.     Sentencing Memorandum Cases – Which One to Compare?

At the December 19, 2017 sentencing hearing, the Court discussed at length, *inter alia*, the argument tethered to 18 U.S.C. § 3553(a)(6) that similarly situated defendants in other cases were given lighter sentences and that therefore Zitalpopoca's sentence represents an unwarranted disparity. Defendant's late-filed, last-minute, codicil about unwarranted disparities suffers from several glaringly obvious flaws.

One problem is that Defendant's memorandum simply sets forth a list of cherry-picked cases that are unfamiliar to this Court (with one exception). The list is a selection of cases presided over by other judges. For each case, Defendant supplies his own description of charges and conduct and the sentence imposed. The sentences imposed range from time served to 153 months and there is no uniformity.[6]

---

[6] Per Defendant's memorandum, the defendant in *U.S. v. Allen*, Case No. 13cr1247, was sentenced to 132 months for violating § 2422(b) (Allen plead guilty). The defendant in *U.S. v. Dickson*, Case No. 11cr1165, was sentenced to 120 months and the defendant in *U.S. v. Alvarado*, Case No. 11cr1256, was sentenced to 108 months. Multiple co-defendants in a prostitution ring case in

It is difficult to imagine which of those cases and/or sentences might serve as a sound basis for comparison or how a court would sort through them to reach a decision. For example, in one case there were 38 defendants. Two defendants received time served. One defendant was sentenced to 153 months. The rest were sentenced to varying amounts in between. Given these disparate sentences, Defendant's real argument is not that a 200 month total sentence is an unwarranted disparity, but rather, that it is higher than the highest sentence imposed in any of the selected cases. Of course, a reasonable judge with prior experience in sentencing would immediately want to ask a few relevant questions about the other cases. For example:

- Did the defendant plead guilty or was the defendant convicted at trial?

- Did the defendant accept responsibility?

- Did the defendant waive appeal?

_____

*U.S. v. Traylor*, 11cr1448, were handed sentences that ranged from 153 months down to time-served (no defendant went to trial; each pled guilty or was dismissed). Other examples from Defendant's memorandum report sentences of 78 months, 68 months, 60 months, 33 months, and 30 months.

Defendant's own sampling of cases demonstrates that it is frivolous to argue that a sentencing disparity is unwarranted when there is no typical sentence and sentences vary widely between time-served and 153 months. In other words, there is no disparity because there is no parity. Defendant was sentenced in this case for a number of crimes, among which is a 100 months sentence for a § 2422 conviction. A 100 month sentence is well within the range of sentences reported in the Defendant's sentencing memorandum.

- Did the defendant provide substantial assistance?[7]

- Was there a fast-track or combination of factors departure, or § 3553(e) variance?

Answers to these obvious questions were not provided by the Defendant. In fact, when defense counsel was asked at the sentencing hearing whether she knew the answers to these questions for the cases listed in her brief, she did not. For example, when asked if a defendant had pleaded guilty or gone to trial, counsel did not know. When asked if a defendant had waived appeal as part of a plea agreement, counsel did not know. When asked if a defendant had cooperated with the government, counsel did not know. When asked if there were any aggravating or mitigating factors, counsel did not know.[8] The poverty of sentencing facts

---

[7] Title 18 U.S.C. § 2422(b) carries with it a minimum mandatory sentence of 120 months. Yet, at least three cases listed in Defendant's sentencing memorandum involve sentences less than 120 months for § 2422(b) convictions. *E.g., U.S. v. Black*, 12cr5048-DMS (60 months); *U.S. v. Arnold*, 08cr274-LAB (78 months); *U.S. v. Place*, 05cr1552 (60 months). A §5K1.1 motion by the government for substantial assistance could explain the discrepancy. Indeed, the public docket report for *Arnold* includes a government sentencing memorandum that signifies a §5K1.1 departure below the minimum mandatory sentence. Defendant's list omits mentioning substantial assistance reductions.

[8] Another obstacle to comparing sentences flows from the vast differences in how the crimes are committed, the duration of the criminal conduct, the personal impact on the particular victims, or the history and characteristics of the defendant. These important sentencing facts are not commonly reported and typically are inaccessible to the court or the parties.

Normally, neither the sentencing judge, nor the parties, will have the benefit

makes meaningful comparisons of other sentences futile.

## B. The Only Familiar Case in the List: *U.S. v. Stephens*

The one case in Defendant's list that the Court does know about is *U.S. v. Stephens*, Case No. 13cr828-BEN. The reason this Court knows about *Stephens* is because it sentenced the defendant in that case. It was the only one that this Court knows much about beyond the cryptic case descriptions sketched out by defense counsel. Stephens was charged with violating 18 U.S.C. § 1594(c) by conspiring to engage in the sex trafficking of children. Stephens pled guilty. Stephens

---

of a presentence report for defendants sentenced by other courts. Consequently, when the argument is made, for example, that a 100-month sentence results in an unwarranted sentencing disparity, neither the parties nor the court have the important sentencing facts.

On the other hand, when the sentencing judge *is* familiar with all of the sentencing facts in a comparable case, a defendant may complain that the court is biased. For example, this Court compared Zitalpopoca's sentence to sentencings in two similar cases with which it was familiar: *U.S. v. Ballard*, Case No. 12cr2559-BEN and *U.S. v. Stephens,* Case No. 13cr828-BEN.

Ballard was charged with violating 18 U.S.C. § 1591(a) and (b) sex trafficking of children. Ballard pled guilty. Ballard waived appeal. The presentence report calculated the sentencing Guidelines range to be 188 to 235 months. After considering the § 3553(a) factors the Court imposed a below-Guidelines sentence of 150 months. *Stephens* was included in Defendant's list of comparison cases and is addressed *infra*. Defendant criticized the Court in his Rule 35 motion: "[A]bsent access to the Presentence Report, defendants such as Mr. Zitalpopoca have no ability to make comparisons on the basis of other defendants' age, health, past substance abuse, or family history." *Def.'s Mot. to Correct Sentence* (filed Dec. 28, 2017), at 6.

waived appeal.  There were mitigating factors which the Court took into account, including the defendant's age, his substance addiction, and the relevant conduct. The Guidelines called for a sentence of 135 to168 months.  After considering the 3553(a) factors, this Court imposed a below-Guideline sentence of 120 months.

After the sentencing hearing in the present case, defense counsel filed a Rule 35 motion.  Incredibly, after having asked the Court to consider the *Stephens* case as one of his smorgasbord of cases, Defendant criticizes this Court in his Rule 35 motion for distinguishing *Stephens* during the sentencing hearing.

## C.   *U.S. v. Smith* **is Omitted Without Explanation**

Confined to sentencing comparisons from Defendant's list, Zitalpopoca's 200 month total sentence appears to be an outlier.  Yet, there was one glaring omission in the list of cases.  For some reason, Defendant failed to include in his list of cases, the case of *U.S. v. Maurice Smith,* Case No. 11cr471-BEN – a case with which this Court is very familiar.  The sentence was affirmed on appeal in *U.S. v. Smith*, 719 F.3d 1120 (9th Cir. 2013).  The omission of *Smith* undermines any persuasive force of Defendant's custom selection of comparable sentences.  In *Smith,* this Court sentenced Mr. Smith at the low end of the Guidelines range to 360 months.  The criminal conduct and the criminal charges were similar.  After considering the § 3553(a) factors and the defendant's age, this Court considered

that 360 months was sufficient but not greater than necessary.  Of course, had

Defendant included *Smith* in its list of cases, Zitalpopoca's 200 month total

sentence would no longer be an outlier.

Once again, in his after-filed Rule 35 motion, Defendant chastises the Court

for even referring to the *Smith* case, of course, claiming bias and prejudice.

Defendant argues that the Court should not have compared Smith's sentence

because Defendant knows nothing about that case.  So, in essence, Defendant

argues: "Judge, you can't use the *Smith* case for comparison because I know

nothing about it, but I expect you to distinguish the smorgasbord of cases in my

memorandum that you know nothing about."

It is probably obvious that the value of using a case like *Smith* for

comparisons comes from the fact that *Smith* is a published opinion that any

attorney can find, it is an authoritative opinion from the court of appeals affirming

the sentence, and the published opinion itself recites two pages of facts, making

comparisons meaningful.  Defendant's cited cases do not have these important

qualities.

**D.    Other Cases**

**1.    *National cases not mentioned***

Another problem with the unwarranted disparities argument made here is

that only local cases were selected by the defense for comparison. Defendant relied on a dozen cases from the Southern District of California. *See Sentencing Memorandum*, filed Mar. 24, 2016, at 8-12. Yet, there is no principled reason for measuring disparity against cases hand-picked from the local district. In fact, it is fair to say that the creation of the United States Sentencing Commission and concomitant Sentencing Guidelines was a response to the inequity of parochial sentencing. *See e.g.*, *U.S. v. Wills*, 476 F.3d 103, 109 (2nd Cir. 2007) (the "primary purpose" of § 3553(a)(6) was "to reduce unwarranted disparities *nationwide*") (emphasis added). The argument for a national comparison has even more force for a § 1328 or a § 2422(a) crime where victims are coerced *to travel* to engage in prostitution. Violations of § 1328 and § 2422(a) are by definition not localized crimes. Yet, Defendant offered no reason for omitting cases and sentences from across the nation, for example, the case of *U.S. v. Todd*, 627 F.3d 329 (9th Cir. 2010).

### 2. *U.S. v. Todd*

*Todd* is a case that went to trial with facts very similar to Zitalpopoca's crime. At trial, Todd was convicted of multiple counts of § 1591 and § 2421 and sentenced to 312 months on the § 1591 counts running concurrently with a 120-month sentence on the § 2421 count. *See* Judgment, Case No. 07cr395-JLR (E.D.

Wash. Sept. 29, 2008). That sentence was affirmed on appeal. 627 F.3d 329.

### 3.    *U.S. v. Bell*

*Todd* resembles another national case: *U.S. v. Bell*, 761 F.3d 900 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 503 (2014). Bell also was convicted by a jury of multiple counts of §§ 1591 and 2422(a) and sentenced to a total of 360 months (with a 240-month sentence on the coercion and enticement to travel in interstate commerce for prostitution counts). 761 F.3d at 906.

### 4.    *Cases cited in Defendant's appeal brief*

Defendant did raise sentences from beyond the Southern District of California in his most recent appeal brief. However, those cases do not reflect an unwarranted sentencing disparity in Defendant's case. Rather, they tend to show that Defendant's 200-month total sentence is not disparate. For example, he mentions *U.S. v. Hornbuckle*, 784 F.3d 549 (9th Cir. 2015). In that case two co-defendants were sentenced to 188 and 151 months for trafficking minors. *Id*. at 551. The sentence was affirmed. The minors, however, were prostituting before meeting the co-defendants and the co-defendants pleaded guilty. *Id.* at 557. Neither fact is present in Zitalpopoca's case. Defendant next mentions *U.S. v. Basa*, 817 F.3d 645 (9th Cir. 2016). Basa was sentenced to 210 months for "providing housing for two 15-year-old girls and facilitat[ing] their having sex

with adult men. *Id*. at 647. The sentence was affirmed. Basa did not use or threaten physical violence and Basa pleaded guilty. *Id.* Neither fact is present in Zitalpopoca's case. Defendant's next published case is *U.S. v. Brooks*, 610 F.3d 1186 (9th Cir. 2010). In that case co-defendants were sentenced to 198 months and 97 months. *Id.* at 1193. The sentences were reversed and remanded because the sentences erroneously included a two-level enhancement for "custody, care, or supervisory control over the girls." *Id.* at 1200. On re-sentencing, Brooks was sentenced to 180 months for each count of conviction (concurrent). *U.S. v. Fields*, No CV112458 PHX-DGC, 2012 WL 5989493 (D. Ariz. Oct. 22, 2012). Defendant next cites *U.S. v. Sanders*, 558 F. App'x 763 (9th Cir. 2014). The *Sanders* memorandum disposition does not offer much detail about the offense or the defendant. It does, however, report a 194-month sentence and that Sanders pleaded guilty and waived his right to appeal. *Id.* at 764. The sentence is close to Defendant's 200-month sentence and Defendant did not plead guilty or waive his right to appeal.

Defendant cited in his appeal brief an older case from this district: *U.S. v. Rashkovski*, 301 F.3d 1133 (9th Cir. 2002). Rashkovski and his co-defendant were convicted at trial. His co-defendant, Nataliya Kozlova, remains a fugitive. Defendant argues in his appeal brief that Rashkovski "trapped" his victim in a

prostitution ring but was only sentenced to 60 months, a sentence much lighter

than 200 months.  But the facts in *Rashkovski* paint a much lighter shade of harm.

Rashkovski did not trick his victims into being smuggled into the United States

and prostitution through false promises of love and nice things.  Defendant omits

to say that Rashkovski was apparently quite up front about his proposition of

prostitution profit sharing.

> To recruit more Russian women, Rashkovski and Kozlova flew to
> Moscow in June 1999 and held meetings to promote the limitless job
> opportunities in the dynamic field of prostitution in the United States.
> To the attendees at one of the meetings . . . Rashkovski explained that
> although it was unlikely he could get visas for all of the women, he
> would make their travel arrangements and pay for the plane tickets.
> The women would repay him with the money they made in his
> "established prostitution business" – $60 per hour of the $200 they
> would charge.

*Rashkovski*, 301 F.3d at 1135.

In a perfect example of why details matter, Defendant cited a case in his

appeal brief without mentioning the sentences imposed.  Defendant describes *U.S.

v. Valenzuela*, 495 F. App'x 817 (9th Cir. 2012) as a case that really did involve

young victims while criticizing Zitalpopoca's 200-month sentence *as if* it involved

young victims.  But the sentences imposed in the *Valenzuela* case are not

mentioned by either Defendant or in the memorandum disposition.  Only by

searching through the federal courts' Pacer case information service for the district

court's docket sheet can one find out what sentences were imposed. Six co-defendants were sentenced in Case No. 07cr11-MMM (C.D. Cal. Nov. 20, 2009). Gladys Valenzuela was sentenced to 480 months. Mirna Valenzuela was sentenced to 360 months. Defendant Maria Vincente was sentenced to 360 months. Defendant Gabriel Mendez was sentenced to 420 months. Defendant Maribel Rodriguez-Vasquez was sentenced to 360 months. Luis Vasquez was sentenced to 71 months. While the important individual sentencing factors are not known, it is fair to say that five of the six *Valenzuela* defendants received much harsher sentences than Zitalpopoca's 200-month sentence – suggesting the absence of an unwarranted upward sentencing disparity for Zitalpopoca.

While Defendant cites other cases, his appeal brief argues that, "perhaps the best example of an unwarranted sentencing disparity is between this case and that of *United States v. Flavors*, 15 F. App'x 491 (9th Cir. 2001)." Flavors was sentenced to 168 months for transporting a 15-year-old from Washington to California for prostitution. A second charge of transporting a 17-year-old was dismissed as part of a plea bargain. Defendant says the two girls were kidnapped, but that is not apparent from the memorandum disposition. What is apparent is that Defendant forced the 15-year-old to prostitute herself for a total of twelve days and he allegedly forced the 17-year-old into prostitution for three days. He

also forced the victims to have sex with himself.

Defendant asserts that by comparison, his own harsher 200-month sentence is obviously unwarranted because his crimes "did *not* involve minors, bondage, rape, or sex slavery."[9]  But the 32-month "disparity" is warranted in view of the facts that: (1) Defendant's crimes lasted much longer than Flavors' three days (in one case) or 12 days (in the other case); (2) though Florencia was 18 by the time she was smuggled into the United States, her victimization began much earlier when she *was* a minor; and (3) Zitalpopoca did not plead guilty as Flavors did. Perhaps *Flavors* is actually a good example of why the "unwarranted sentencing disparity" argument is insubstantial.

### 5.    *Other cases from the Government's brief*

It is fair to say that Defendant has not surveyed the entirety of sentences in similar federal cases.  The Government offers some additional cases for comparison.  Gov't. Sentencing Mem. and Resp. (filed Dec. 11, 2017), Exhibit 5. One such similar case is *U.S. v. Carreto*, 583 F.3d 152 (2d Cir. 2009).  In *Carreto*, two defendants were sentenced to 50 years and a third was sentenced to 25 years. Another case cited is *U.S. v. Mendez*, 362 F. App'x 484 (6th Cir. 2010), where the

---

[9]The memorandum disposition does not actually mention bondage, rape, or sex slavery; rape is certainly implied.

defendant was sentenced to 600 months. A third case is *U.S. v. Cortes-Meza*, 685 F. App'x 731 (11th Cir. 2017), where the defendant was sentenced to 480 months. In affirming the 480-month sentence, the Eleventh Circuit Court of Appeals dispatched one of Zitalpopoca's arguments in observing, "[t]hat Defendant received a harsher sentence than his co-defendants does not mean that his sentence was unreasonable. In fact, this court has recognized that a 'disparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal.'" *Id*. at 738.

The Government cites a number of other federal cases in a similar vein. Each involves longer sentences than 200 months. One case deserves special mention: *U.S. v. Fields*, 625 F. App'x 949 (11th Cir. 2015). In *Fields,* the defendant carried out a similar course of criminal conduct targeting women who were vulnerable, prompting the district court to remark, "That's exactly what you were, you were a predator . . . . you were preying on those young women because they were just that. They were vulnerable." Gov't. Sentencing Mem., Exhibit 5, at 2. The court sentenced defendant to 480 months. That sentence was affirmed on appeal.

## E.     Comparing to Co-Defendants

Defendant's Sentencing Memorandum is flawed in another even more

obvious way. Defendant argues that this Court's sentence was much higher than that imposed on the two co-defendants and that the Court did not explain the disparity. The reason why the Court did not need to explain the difference in sentences was well known to Defendant and would be obvious to anyone else in a New York minute.

Co-defendant No. 1 was convicted of one count of violating 8 U.S.C. § 1328. So was co-defendant No. 2. Defendant, on the other hand, was convicted of two counts of Aiding and Abetting Harboring Aliens for Purposes of Prostitution under 8 U.S.C. § 1328, two counts of Aiding and Abetting Bringing Illegal Aliens into the United States for Financial Gain under 8 U.S.C. § 1324(a)(2)(B)(ii) (a conviction under this statute carries a minimum mandatory three-year sentence), two counts of Aiding and Abetting Harboring Illegal Aliens under 8 U.S.C. § 1324(a)(1)(A)(iii), and Aiding and Abetting Persuasion or Coercion to Travel to Engage in Prostitution under 18 U.S.C. § 2422(a).

Both co-defendants entered pleas of guilty. Both co-defendants waived appeal. There was no evidence that the co-defendants induced, enticed, or even knew that Florencia and Annabel had traveled in interstate commerce. There was no evidence that the co-defendants ever coerced Annabel and Florencia or used any type of physical violence against them. There was no evidence that the co-

defendants participated or arranged for Annabel and Florencia to be smuggled into the United States. The co-defendants' involvement was of very short duration.

It is true that the co-defendants received shorter sentences. But the reasons for the shorter sentences are obvious. Furthermore, the Court found that each co-defendant had a minor role in Zitalpopoca's criminal operation. Specifically, co-defendant Eduardo Aguila-Tecuapacho provided a place for Annabel to live while she was in the United States. He was also the owner of two vehicles used to transport Florencia to work. He was the subscriber of the phone used to arrange for prostitution dates. Co-defendant Carlos Tzompantzi also lived with Annabel and Defendant. He admitted to driving Annabel on one occasion to an address where Annabel performed acts of prostitution.

Additionally, neither co-defendant had any history of other violations of U.S. laws – unlike Zitalpopoca who had illegally entered the United States numerous times and had been deported or removed but chose to re-enter illegally for purposes of conducting his sex trafficking business. Each co-defendant accepted responsibility early in the case and pleaded guilty. Each agreed to an appeal waiver, saving the government and the public time and expense. That the conduct ascribed to the co-defendants was dissimilar to Defendant's conduct, as this Court stated previously, is glaringly obvious. Given the long, unlawful,

degrading, dehumanizing, and violent course of conduct of Defendant's

sophisticated trafficking conduct, the co-defendants' shorter sentences for their

limited conduct do not demonstrate unwarranted sentencing disparities.

## F.   *U.S. v. Treadwell* Already Rejected the Same Approach

Finally, Defendant's overall approach to arguing an unwarranted sentencing

disparity was roundly rejected in *U.S. v. Treadwell,* 593 F.3d 990, 1011-12 (9th

Cir. 2010), *cert. denied*, 562 U.S. 973 (2010) (affirming 360 months total sentence

for defendant found guilty of fraud in $40 million Ponzi scheme).  *Treadwell*

teaches that the mere fact that a defendant can point to some other defendant

convicted at a different time of a different crime "does not create an 'unwarranted'

sentencing disparity."  593 F.3d at 1012.  *Treadwell* describes several reasons why

such an approach is unconvincing:

> Nor does it matter for the purposes of § 3553(a) that Treadwell can
> point to a specific criminal defendant, like Rigas, who may have
> received a lighter sentence for a different fraud.  A district court
> considers the § 3553(a) factors to tailor a sentence to the specific
> characteristics of the offense and the defendant.  "It has been uniform
> and constant in the federal judicial tradition for the sentencing judge
> to consider every convicted person as an individual and every case as
> a unique study in the human failings that sometimes mitigate,
> sometimes magnify, the crime and the punishment to ensue."  The
> mere fact that Treadwell can point to a defendant convicted at a
> different time of a different fraud and sentenced to a term of
> imprisonment shorter than Treadwell's does not create an
> "unwarranted" sentencing disparity.  *For one thing, we aren't*

> *presented with the records in the cases on which Treadwell relies*
> *when he argues that other fraud defendants got off better than him.*
> *Moreover, sentencing disparity is only one factor a court considers in*
> *crafting an individualized sentence under § 3553(a).* *A district court*
> *need not, and, as a practical matter, cannot compare a proposed*
> *sentence to the sentence of every criminal defendant who has ever*
> *been sentenced before.* *Too many factors dictate the exercise of*
> *sound sentencing discretion in a particular case to make the inquiry*
> *Treadwell urges helpful or even feasible.*

*Id.* at 1011-12 (citations omitted) (emphasis added).

Zitalpopoca's approach is as flawed as the argument dismissed in

*Treadwell.* And even though *Treadwell* was decided several years ago, Defendant

has not offered (either in his briefing in this court or in his appellate briefing) any

reason to overlook *Treadwell.* Zitalpopoca may not discuss it, but it remains the

law of the circuit. *See U.S. v. Kahre*, 737 F.3d 554, 583 (9th Cir. 2013) (quoting

*Treadwell*, 593 F.3d at 1012); *see also U.S. v. Burgum*, 633 F.3d 810, 813-14 (9th

Cir. 2011) ("The district court was not required to conform the sentence to those

imposed in similar cases . . . . [D]ivergence from sentences imposed in similar

cases is permissible so long as the court is attentive to relevant sentencing

factors").

## G. Final Points

### 1. *No national average data*

Two final points deserve mention. In his memorandum, Defendant attempts

to identify a national average sentence.  However, national sentencing data is not

published about the crime of transportation for prostitution/sex (*e.g.*, 18 U.S.C. §§

2421; 2422(a)).  For example, on appeal Defendant incorrectly claimed that one

could look to the Annual Report of the U.S. Sentencing Commission to establish

that his sentence was an unwarranted disparity.  Defendant incorrectly relied on

data concerning the Commission's primary offense category of "sexual abuse."

However, Defendant's assumption is wrong.  The crime of transportation for

prostitution/sex (§ 2422(a)) is not counted by the Commission in the primary

offense category of "sexual abuse."[10]  In fact, it is not counted separately at all.[11]

---

[10]The primary offense category of "sexual abuse" is described as: *"Sexual Abuse* includes sexual abuse of a minor, transportation of minor for sex, sexual abuse of a ward, criminal sexual abuse, and abusive sexual contact." *2016 Annual Report and 2016 Sourcebook of Federal Sentencing Statistics*, at S-165.

[11] To confirm that the "Sexual Abuse" category was the wrong category to use for sentences on transportation of adults for prostitution/sex, the undersigned telephoned the Sentencing Commission's general phone number.  An unnamed staff person confirmed that the Commission receives very little sentencing data about crimes of transportation of adults for prostitution/sex and that there is no separate category for such sentences.  More to the point, the staff member confirmed that the primary category of "Sexual Abuse" is not the correct category.

The Sentencing Commission is an independent commission created by Congress to reside within the Judicial Branch of government.  *U.S. v. Ruiz-Villanueva*, 680 F. Supp. 1411, 1419 (S.D. Cal. 1988) (Enright, J.) ("the Commission is properly regarded as an independent commission within the judiciary"); 28 U.S.C. § 991(a) ("There is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission").  As such, it is not an improper contact or an extrajudicial source. See Canon 3A(4), Code of Conduct for United States Judges ("A judge may

Prior to 2010, the data was included in a different primary offense category

labeled "Pornography/Prostitution." *See* U.S. Sentencing Commission*, 2016*

*Annual Report and 2016 Sourcebook of Federal Sentencing Statistics*, at S-167.[12]

Since 2010, the Commission averages the data in a catch-all category of "Other

Miscellaneous Offenses."[13]  Consequently, Defendant's entire argument based

---

consult with other judges or with court personnel whose function is to aid the judge in carrying out adjudicative responsibilities.").

    At least one respected jurist has taken this same approach when confronted with a question of sentencing disparities and a dearth of data. *See U.S. v. Parris*, 573 F. Supp. 2d 744, 752 (E.D. N.Y. 2008) (Block, J.) ("For my part, I reached out to the Sentencing Commission and learned that it does not keep such statistics.").

    [12]*Pornography/Prostitution* includes dealing in obscene matter, transportation of minor for prostitution, *transportation for prostitution/sex (adult)*, sexual exploitation of minors, materials involving sexual exploitation of minors, obscene telephone or broadcasting, and selling or buying children for pornography.  This primary offense category was discontinued in fiscal year 2010.  Some of the offenses that were grouped into this primary offense category in prior fiscal years are grouped into the *Child Pornography* primary offense type.  All other offenses that were grouped into this primary offense category in prior fiscal years are included in the *Other Miscellaneous Offenses* primary offense category. *2016 Sourcebook*, at S-167 (emphasis added).

    [13]*Other Miscellaneous Offenses* includes illegal use of regulatory number — drugs; illegal transfer of drugs; illegal regulatory number to get drugs; drug paraphernalia; forgery/fraud for drugs; dangerous devices to protect drugs; manufacture drugs against quota; endangering life while manufacturing drugs; operate carrier under drugs; endangerment from hazardous/toxic substances; mishandling substances, records, *etc.*; threat of tampering with public water system; hazardous devices on federal lands; mishandling other pollutants, records, *etc.*; improper storage of explosives; record keeping violation — explosives; possession of other weapon — on aircraft, in federal facility; failure to report theft of explosives; feloniously mailing injurious articles; transport of hazardous material in commerce; interference with flight crew, other offense — aboard

upon the Sentencing Commission reporting rests on a faulty foundation.

## 2. *Concurrent vs. consecutive sentences*

Lastly, Defendant never addresses the fact that he was found guilty of multiple crimes having different elements and against multiple victims. As a result, Defendant never addresses the Court's decision to impose concurrent or consecutive sentences. Whether sentences run concurrent or consecutive is within the court's discretion under 18 U.S.C. § 3584. *See e.g., U.S. v. Werle,* Case No. 14cr041-JLQ, 2016 WL 4205354 *5 (E.D. Wash. Aug. 8, 2016) (180-month concurrent sentence vacated on appeal and reimposed as 140-month consecutive sentences pursuant to § 3584). In Zitalpopoca's case, the total length of the sentence is composed of multiple sentences. Some run concurrently. Some run consecutively. On this point, Defendant is silent.

## IV. THE §3553(a) FACTORS APPLIED TO ZITALPOPOCA

This Court finds that its sentence orally pronounced on December 19, 2017

---

aircraft; criminal infringement of copyright/trademark; conflict of interest; unauthorized payment; non-drug forfeiture; impersonation; false statement to Employee Act; reporting offenses — labor related; criminal infringement of trademark; unlawful conduct relating to control/cigarettes; trespass; destruction of property; destruction of mail; aircraft piracy; conspiracy to murder (no death, assault, or attempt); conspiracy to commit murder; and all other miscellaneous offenses not previously listed in any of the other categories. *2016 Sourcebook*, at S-168.

is sufficient, but not greater than necessary.  The Court has discussed from the bench on several occasions its analysis of the § 3553(a) (1) through (5) sentencing factors as applied to Zitalpopoca.  The reasons and explanations given at each sentencing hearing are re-adopted here.  These comments are made simply for the purpose of further explanation.

During its sentencing hearings, the Court has used strong language such as "predator" and "vulnerable" victim.  These terms are used carefully to accurately describe the Defendant's criminal actions and the female victims, respectively.  In ordinary English usage, a predator is: "A person who ruthlessly exploits others; 'a sexual predator.'"  *Oxford Living Dictionary*, https://en.oxforddictionaries.com; *see also Oxford Learning Dictionary*, https://www.oxfordlearnersdictionaries.com (predator: " person or an organization that uses weaker people for their own advantage").  This correctly described Defendant's criminal behavior.  Was his behavior "egregious?"  Yes it was.  As one dictionary defines the word, his criminal behavior was "conspicuously bad or offensive."  *American Heritage Dictionary of the English Language*, https://www.ahdictionary.com.;  *cf. U.S. v. Bernado*, 818 F.3d 983, 985 (9th Cir. 2016) (affirming Guidelines enhancement for "egregious" conduct of alien smuggling by strapping a woman inside a car dashboard).

Similarly, to describe the two individual female victims in this case, the adjective "vulnerable" was used according to the ordinary meaning given in English usage – not in the legal sense defined by U.S.S.G. § 3A1.1(b) (examples of this include individuals who are "unusually vulnerable due to age, physical or mental condition, or who are otherwise particularly susceptible to the criminal conduct."). *See* U.S.S.G. § 3A1.1, cmt. n. 2. In ordinary usage, "vulnerable" means "able to be easily hurt, influenced, or attacked." *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english. This is precisely what this Court meant when it described Annabel and Florencia. These victims were vulnerable. These victims were unlike those in other § 2422 cases (and the cases under the predecessor statute) where women who were *already* prostitutes were simply recruited to travel from place A to place B. There can be little argument that there is a difference in actual vulnerability when one compares an adult prostitute who is recruited to travel to another place to work, and Annabel and Florencia. Some may believe that these young girls were not vulnerable in the ordinary sense. This Court vehemently disagrees.

This Court has considered the types of punishment available. The Court could have imposed a within-Guidelines sentence. Acknowledging that the Guidelines are the starting point for determining a sentence, the Guidelines would

be as follows:

| | |
|---|---|
| Base offense level | 14 |
| Aggravating role adjustment | +2 |
| Multiple count adjustment | +2 |
| Adjusted offense level | 18 |
| Criminal history category | I |
| Guidelines range | 27-33 months |

The Court finds that a Guidelines sentence does not fully account for all of Defendant' conduct. The Court is required to impose a mandatory minimum sentence of three years for the convictions under § 1324(a)(2)(B)(ii) and could have imposed a maximum sentence of 240 months on the § 2422(a) conviction or consecutive sentences on all counts. That sentence, however, would in this Court's view, be greater than necessary.

The Court considered all of the § 3553(a) factors. Some considerations deserve highlighting. Concerning the seriousness of the offense, there can be no doubt that human trafficking is a serious offense. This Defendant operated a sophisticated sex trafficking organization. He preyed upon the vulnerability of at least two young women, one of whom was a minor when he first recruited and groomed her. During his course of conduct he lied, played on their emotions, isolated them, brutally beat them, and smuggled them into the United States with one intention - to use their bodies for sale.

Concerning Defendant's history and characteristics, it is noted that Defendant has illegally entered into the United States on several occasions. He has been removed, deported or excluded on July 17, 1998, August 1, 1998, May 24, 2001, and December 16, 2004. He was arrested on January 1, 1996 and was charged with violating Calif. Penal Code § 245(a)(1) Assault Great Bodily Injury and with a Deadly Weapon. For whatever reason the charges were ultimately dismissed. He was convicted on May 23, 2001 on charges of misdemeanor burglary in violation of Calif. Penal Code § 459 and Cal. Vehicle Code § 10852 for tampering with a vehicle. He admitted that, "I did break and enter another vehicle with intent to commit theft."

There is no credible evidence that he has ever held an honest job in the United States or elsewhere. There is no credible evidence that the Defendant has any meaningful or close family ties except those members of his family who were participants in the offenses.

Defendant has argued that he maintains relationships with his children. This Court notes there is no evidence that the relationship is close. Worthy of note is that this Defendant has been before this Court on four sentencing occasions, yet not once has the Defendant submitted any letters of support from his children or others. Defendant has expressed remorse, but it is impossible to determine if he

really is remorseful or whether his remorse is feigned. That he has a motive to feign remorse can hardly be questioned.

Concerning the sentencing factors of protecting the public and deterring further criminal conduct (§§ 3553(a)(2)(B) and (C)), a special comment is deserved. Section 3553(a) provides that the sentence should provide general and specific deterrence. In the usual case, a judge is required to predict the length of sentence that will both deter further criminal conduct and protect the public from further crimes of the defendant. But in this case, the salutary effect of the sentence imposed has been admitted by the Defendant, himself. Assuming, without conceding that Defendant's assertions are true, it is self-evident that this Court's sentence has served as a deterrent to Defendant and his trafficking family and protected the public.

According to defense counsel at the hearing, Defendant has had a change of mind and will not engage in this same criminal conduct upon his release. Counsel has reported that Defendant told her, "about the first year after he was caught . . . he thought, well, this case is going to blow over . . . And I can just wait it out and then I'll go back to Mexico, and I'll take this up again and do what I was doing before." Over time, he has changed, according to his counsel. Now, after serving his sentence, Defendant wants to return to Mexico and work with his father in his

business buying and selling livestock.  In other words, deterrence has been

achieved, assuming the report is accurate.

Moreover, family members who were formerly engaged in his criminal

prostitution business, have turned away from crime and are pursuing other kinds

of work.  Defense counsel has explained, "I think as the records show, his family

was somewhat involved in – in this business.  As a result of Mr. Zitalpopoca's

letters, and the sentence received in this case, his family has turned away."  The

sentence has proven to be effective in deterring criminal conduct.

Concerning the protection of the public, because Defendant has become a

different person, and because of his sentence, other vulnerable women have been

saved from suffering the fates of Annabel and Florencia.  According to

Defendant's counsel,

> Mr. Zitalpopoca is very grateful to the Court because not only has he
> become a different person, but because of what the Court has done,
> *probably numerous women in Mexico have not suffered the same fates as
> the victims in this case*.

Transcript of Proceedings on December 19, 2017, at 5 (emphasis added); *see also*

*Defendant's Sentencing Memorandum* (filed December 7, 2017), at 11 ("[H]is

family slowly began to disentangle themselves from the prostitution business and

take up other vocations . . . . Mr. Zitalpopoca has not only reformed himself, he

has reformed his family, and by so doing has likely prevented dozens of women from becoming involved in the prostitution trade."). Once again, assuming the report is accurate, the sentence has already had an effect on protecting the public.

The Court, of course, takes Defendant's contrition and representations as to his family's disentanglement with a grain of salt.[14] That convicted defendants will have a motive to paint the proverbial rosy picture is well known. *Cf. Nielson v. United States*, 24 F.2d 802, 803 (9th Cir. 1928) (defendant's statement, "was so obviously self-serving that the question of the propriety of excluding it requires no discussion."). Additionally, the Court notes Defendant's self-professed relationship with his daughter and his family's "disentanglement." Yet, no corroborating or supporting evidence has been submitted to this Court at any of the sentencing hearings. In well over 2,600 sentencing hearings that this Court has presided over it is not unusual, in fact, it is quite common for letters of support and corroborating evidence to be submitted at the sentencing hearing. The lack of such evidence in this case is highly suspect. [15]

---

[14]It could be said that the public has been and will be protected only so long as Defendant remains incarcerated and unable to personally conduct his criminal activities or play the key role he formerly played in his family's prostitution business.
    [15]To be clear, this Court has considered in the imposition of its re-sentencing the possibility of post-sentencing and post-offense rehabilitation. *U.S. v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) ("[T]he Supreme Court made clear that post-

Finally, while the sentence already imposed has protected the public at large from the scourge of human sex trafficking, it could be said that it has also protected individual women from being smuggled into the United States to suffer the emotional and psychological damage of this type of crime.

Annabel filed a victim impact statement[16] at the original sentencing. *See* Statement (filed June 7, 2010) (Docket No. 121-2). In her victim impact statement Annabel said: "The psychological and physical damages have been severe and unforgettable"; "At the moment I am undergoing therapy"; "The psychological damages . . . are irreparable"; "Is there any woman, by any chance, that deserves the suffering, the shame, the enslavement I went through?"; and "I still feel very affected in every aspect of my life . . . ."

Florencia also filed a victim impact statement. *See* Sentencing Document (filed Dec. 17, 2017) (Docket No. 225). In her statement she said: "You isolated me from the world because I was afraid of an evil person like you. I wish that I never met you, that this was all a dream. I had nightmares for the longest [time].

---

sentencing or post-offense rehabilitation – particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct – was a critical factor to consider in the imposition of a sentence.").

[16]A court may consider the "life-destroying impacts" of the crime as described in a victim impact statement. *U.S. v. Christensen*, 732 F.3d 1094, 1104 (9th Cir. 2013).

You affected my life physically [and] psychologically in so many ways." She reflected, "You preyed on young naive women who were vulnerable targets."

It has been argued that there was no lasting emotional or psychological injury to the victims. However, this Court chooses to believe the victims. Psychologists may not have opined at trial about the psychological damage suffered by Annabel and Florencia, but it was clear to hear and see. To find lasting psychological harm where two young women were duped into selling their bodies to hundreds of men, to line Defendant's pockets and the pockets of his family, coupled with degrading and at times violent conduct, does not require specialized knowledge or skill. As the Defendant's own briefing acknowledges,

> But after the enormity of his conduct and the consequences of it began to sink in, Mr. Zitalpopoca began to feel deeply ashamed of what he had done. He realized the emotional, psychological, sexual, and physical damage he had inflicted on Ms. Calixto and Ms. de la Cruz. He realized . . . he had ruined both his own life and the lives of his victims and his family members.

*Defendant's Sentencing Memorandum* (filed December 7, 2017), at 10. Given Defendant's conduct and the harm to Annabel and Florencia, this Court believes its sentence is just punishment.

Having considered all of the above pursuant to the Sentencing Reform Act, this Court has sentenced the Defendant to a total sentence of 200 months. Given

that the Defendant has admitted his participation in this sophisticated trafficking organization, his admission that his sex trafficking has and would have caused harm to other women and given the harm to Florencia as reflected in her victim impact statement, this Court finds that a fine of $250 is appropriate. The Defendant shall also pay a penalty assessment of $100 per count for a total of $700. The Court finds that the $5,000 JVTA assessment is not applicable. And finally, the Defendant shall be on three years of supervised release for each count, concurrently, on the conditions previously stated at the oral sentencing hearing and in the written conditions of supervised release attached to the Judgment, which are incorporated herein by reference.

///

///

///

///

///

///

///

///

///

///

## V.  CONCLUSION

Having considered the Sentencing Guidelines, the statutory maximum

sentences prescribed by Congress, and the § 3553(a) factors both as set forth here

and in prior oral pronouncements from the bench, the Court judges that the

sentence it has imposed is sufficient but not greater than necessary and does not

create an unwarranted sentencing disparity.

It is so ordered.

DATED:  March 29, 2018

Hon. Roger T. Benitez
United States District Judge